# Division of Powers and Responsibilities Between the Chairperson of the Chemical Safety and Hazard Investigation Board and the Board as a Whole

Under the Clean Air Act Amendments of 1990 and general principles governing the operation of boards, the day-to-day administration of Chemical Safety and Hazard Investigation Board matters and execution of Board policies are the responsibilities of the chairperson, subject to Board oversight, while substantive policymaking and regulatory authority is vested in the Board as a whole.

In disputes over the allocation of authority in specific instances, the Board's decision controls, as long as it is not arbitrary or unreasonable.

June 26, 2000

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
CHEMICAL SAFETY AND HAZARD INVESTIGATION BOARD

You have asked for our opinion regarding the legal division of powers and responsibilities between the chairperson of the United States Chemical Safety and Hazard Investigation Board ("Board") and the Board as a whole. This memorandum responds to your request.

The Board was established under section 301 of the Clean Air Act Amendments of 1990 (the "Act") as a tenure-protected agency charged with investigating and monitoring accidental chemical releases at industrial facilities and in transport. *See* Pub. L. No. 101–549, § 301, 104 Stat. 2399, 2565–70 (1990) (codified at 42 U.S.C. § 7412(r)(6) (1994)). The Act provides that the Board "shall consist of 5 members, including a Chairperson, who shall be appointed by the President, by and with the advice and consent of the Senate." 42 U.S.C. § 7412(r)(6)(B). "The Chairperson," the Act continues, "shall be the Chief Executive Officer of the Board and shall exercise the executive and administrative functions of the Board." *Id.* The Act vests in the Board a range of powers and responsibilities relating to investigating, monitoring, and reporting accidental chemical releases. *See id.* § 7412(r)(6)(C)–(S). It further provides that "[t]he Board is authorized to establish such procedural and administrative rules as are necessary to the exercise of its functions and duties." *Id.* § 7412(r)(6)(N).

As we understand it, a basic disagreement has existed for some time between the former chairperson of the Board, who resigned as chairperson on January 12, 2000, but is still a Board member, and the other Board members regarding the relative authority of the chairperson and the Board as a whole under this statutory scheme.[1] The former chairperson maintains that "the statute provides [the chair-

---

[1] The Board's Office of General Counsel, at the request of the Board, examined this issue and presented a written opinion to the Board on August 30, 1999. *See* Memorandum for the Chemical Safety and Hazard Investigation Board, from Christopher Warner, General Counsel, *Re: Board Governance Issues* (Aug. 30, 1999) ("Warner Memorandum"). When this opinion failed to resolve the dispute, both the chairperson and the other Board members, in separate letters, requested our views on the subject *See* Letter for Beth Nolan, Assistant Attorney General, Office

person] . . . with complete authority over all aspects of the [Board] except that all of the Board Members must vote on three items: approval of Board Investigation Reports, recommendations to the Administrator of [the Environmental Protection Agency (EPA)] and the Secretary of Labor, and approval of regulations to be published in the *Federal Register.*" December Hill Letter at 1. The Board, by contrast, believes that the Act places day-to-day administration of the Board in the chairperson's hands, subject to the Board's general policies and directives, while conferring on the Board responsibility for the various substantive functions that are outlined in its statute; that the Board decides whether a matter is an administrative concern of the chairperson or a substantive concern of the Board, as long as its views are reasonable; and that, in the absence of Board policy on a specific issue, the chairperson possesses substantial discretion to act on his own. *See* Warner Memorandum at 2; November Board Letter (stating that the Board believes that the Warner Memorandum is correct).

We believe that, under the Act and general principles governing the operation of boards, the day-to-day administration of Board matters and execution of Board policies are the responsibilities of the chairperson, subject to Board oversight, while substantive policymaking and regulatory authority is vested in the Board as a whole. In disputes over the allocation of authority in specific instances, the Board's decision controls, as long as it is not arbitrary or unreasonable.

We note at the outset that we do not address the details of how these principles apply to specific management and governance areas in which disagreements might arise between the chairperson and the Board.[2] Indeed, when addressing a similar set of questions regarding the relative authority of the chairman of the Interstate Commerce Commission ("Commission") and the Commission members over the administrative and substantive affairs of the Commission, we observed that "this Office is neither well-suited nor sufficiently well-versed, as a practical matter, in the internal workings of the Commission to provide more than a general response" to the questions being addressed. Memorandum for Reese K. Taylor, Jr., Chairman, and Heather Gradison, Commissioner, Interstate Commerce Commission, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel at 1 (Dec. 8, 1983). We think that an apt observation in the Board's case as well. Nevertheless, we believe that our discussion of the Board's organization and of the background principles governing deliberative bodies against which it operates should be sufficient to guide you in resolving disagreements about the proper balance of authority in the Board's affairs.

---

of Legal Counsel, from the Chemical Safety and Hazard Investigation Board (Nov 16, 1999) ("November Board Letter"); Letter for Randolph D. Moss, Acting Assistant Attorney General, Office of Legal Counsel, from Paul L. Hill, Jr., Chairperson, Chemical Safety and Hazard Investigation Board (Dec 1, 1999) ("December Hill Letter"). Both have agreed to be bound by our opinion *See* November Board Letter; December Hill Letter at 2.

[2] *See* Warner Memorandum at 18–31, 18 (analyzing specific management and governance areas with an eye toward "limit[ing] areas of potential disagreement"). By this statement, we mean neither to call into question nor to affirm the specific legal conclusions of the Board's General Counsel in this regard

We begin with the language of the Act. As noted above, the Act provides that the chairperson "shall be the Chief Executive Officer of the Board and shall exercise the executive and administrative functions of the Board." 42 U.S.C. § 7412(r)(6)(B). The terms "Chief Executive Officer" and "executive and administrative functions" are decidedly vague, and nowhere does the Act define them. Even so, the terms do provide some general guidance on the proper division of authority between the chairperson and the Board as a whole. They make clear that it is the "executive" and "administrative" aspects of the Board's business — as opposed to its substantive and policymaking functions as laid out in the rest of the statute (*see id.* § 7412(r)(6)(C)–(S)) — that are the province of the chairperson as chairperson. The chairperson, in other words, superintends and carries out the day-to-day activities necessary to effectuate the Board's substantive decisions.[3] He does not, absent some form of Board approval (such as an express delegation by the Board or the Board's acquiescence in the chairperson's actions, *see infra* pp. 108–10), make those decisions by himself.

The Act also empowers the Board to "establish such procedural and administrative rules as are necessary to the exercise of its functions and duties." 42 U.S.C. § 7412(r)(6)(N); *see also* S. Rep. No. 101–228, at 236 (1989), *reprinted in* 1990 U.S.C.C.A.N. 3385, 3620 ("The Board is given authority to promulgate administrative rules as may be necessary to carry out its functions."). These could include rules bearing on matters of internal Board governance (such as voting procedures and the delegation of Board authority and responsibilities) as well as rules governing the conduct of Board business with the public (such as investigations and hearings). To the extent the Board establishes such rules, the chairperson, as the Board's administrative and executive officer, must put them into practice.

Furthermore, the chairperson is subject in the exercise of his functions and duties as chairperson to oversight by the Board as a whole and to such general policies and decisions that the Board is authorized to make. Indeed, that this must be so flows from the very nature of the chairperson's office as the executor and administrator of the Board's decisions and policies, which the Board can modify or amend as circumstances or programmatic objectives require. It is also spelled out in the Act's legislative history, which unambiguously states that "[t]he chair's conduct of the executive function is subject to oversight by the Board as a whole." S. Rep. No. 101–228, at 229, *reprinted in* 1990 U.S.C.C.A.N. at 3613.

To be sure, this does not mean that the Board, exercising its oversight authority and its powers to make substantive decisions and "such procedural and administrative rules as are necessary to the exercise of its functions and duties," may or should attempt to address itself to the plethora of minute administrative prob-

---

[3] Webster's Third New International Dictionary of the English Language defines "execute" as, among other things, "to put into effect" and "to carry out fully." *Webster's Third New International Dictionary of the English Language, Unabridged* 794 (1993). It defines "administer" as, among other things, "to manage the affairs of." *Id.* at 27; *see also Webster's Ninth New Collegiate Dictionary* 434 (1986) (stating that "execute" and "administer" both mean "to carry out the declared intent of another").

lems bound up with the operation of a complex organization. Some degree of managerial discretion is inherent in the concept of an executive or administrative office, and the statutory assignment of the Board's executive and administrative functions to the chairperson necessarily vests the chairperson with a degree of managerial autonomy on which the Board, in the proper exercise of its powers, cannot trench. Likewise, some day-to-day aspects of Board affairs may be so unrelated to the Board's effective execution of its statutory responsibilities that they cannot be said to be proper objects of the full Board's authority. At the same time, however, any number of Board activities or day-to-day aspects of Board business, while at least in part administrative and even seemingly mundane, may involve or affect the Board's duties and functions in ways that are of legitimate concern to the Board as a whole. Where that is the case, it is the prerogative of the Board to pass upon such issues in ways appropriate to its function as a policymaking and rule-setting body.

Aside from the general delineation of powers, the Act itself does not address, with specificity or precision, when particular aspects of Board business should be said to be a legitimate concern of the Board as a whole or, in contrast, should be left to the chairperson as the Board's executive and administrative officer. The Act's legislative history does state that, while the Board has the power to hire staff, "[t]he chairperson of the Board is given authority for directing the work and assignments of the staff except that each Board member shall be assigned such personal staff as are necessary to carry out responsibilities of a member." S. Rep. No. 101–228, at 229, *reprinted in* 1990 U.S.C.C.A.N. at 3613. Immediately following this statement, however, is the declaration that "[t]he chair's conduct of the executive function is subject to oversight by the Board as a whole." *Id.* So even when it comes to directing staff work and assignments, the legislative history appears to contemplate that the chairperson may have to answer to the Board in some respects. Again, however, the statute does not specify the precise bounds of the Board's oversight authority.

In light of the lack of explicit statutory guidance on the issue, we believe that, under the general principles of corporate common law that we have previously found instructive in similar cases, the Board as a whole, acting reasonably, has the final authority to resolve disputes over whether a specific matter is within its oversight authority or is an administrative or executive concern of the chairperson or a legitimate concern of the Board as a whole. Our past opinions addressing governance issues raised by multi-member boards and commissions have repeatedly recognized that basic and well-established principles of corporate common law make clear "that the basic premise governing deliberative bodies is that the majority rules." Letter for Mason H. Rose V, Chairperson, United States Architectural and Transportation Barriers Compliance Board, from Larry L. Simms, Deputy Assistant Attorney General, Office of Legal Counsel at 2 (Sept. 17, 1981) ("Rose Letter"); *see also* S. Rep. No. 101–228, at 229, *reprinted in*

1990 U.S.C.C.A.N. at 3613 (stating that "[t]he Board will operate by majority vote").[4] In resolving a dispute between members of the Architectural and Transportation Barriers Compliance Board ("Compliance Board") and its chairperson over the authority to call an additional meeting of the Compliance Board, for example, we relied on the majority-rule principle to conclude that the Compliance Board had the authority to call an additional non-emergency meeting despite the lack of a rule authorizing it to do so. *See* Rose Letter at 4. We observed that, given that principle, "[i]t would . . . be anomalous to conclude that the Board cannot deal with the situation because the rules are silent" on the issue. *Id.* Likewise, on separate occasions, we applied general principles regarding a board's authority to act to conclude that both the Federal Home Loan Bank Board and the Advisory Board of Cuba Broadcasting could meet and conduct business without a properly appointed chairperson. In both cases we pointed out that, in the absence of specific statutory prohibitions barring the boards from acting without a chairperson, business transacted at board meetings would be valid so long as the meetings complied with basic rules of corporate common law governing notice to and attendance of board members. *See Federal Home Loan Bank Board — Chairman — Vacancy — Reorganization Plan No. 3 of 1947 (5 U.S.C. App. 1), Reorganization Plan No. 6 of 1961 (5 U.S.C. App.)*, 3 Op. O.L.C. 283, 284 (1979); *Authority of the Advisory Board for Cuba Broadcasting to Act in the Absence of a Presidentially Designated Chairperson*, 24 Op. O.L.C. 24, 25–27 (2000). Finally, we noted when passing on an issue concerning the legal authority of the National Commission on Neighborhoods to enter into a proposed agreement that where a statute "is silent as to [a c]ommission's internal organization, practices, and procedures[, t]he clear implication is that these matters are to be decided by the members of the [c]ommission." *National Commission on Neighborhoods (Pub. L. 95-24) — Powers — Appropriations*, 2 Op. O.L.C. 366, 367 n.5 (1977); *cf.* Memorandum for Tim Saunders, Acting Executive Clerk, Executive Clerk's Office, from Richard Shiffrin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Appointment of a Chairperson of the World War II Memorial Advisory Board* at 2 (Nov. 21, 1994) (noting that, if a chairperson were appointed to the World War II Memorial Advisory Board, the board would remain "free under general parliamentary law to make or amend its own rules for such matters as conducting business and calling meetings"). These principles, we believe, apply with equal force here.

These principles also undermine the former chairperson's view that the Act's designation of the Board's chairperson as its "Chief Executive Officer" significantly expands the chairperson's statutory responsibilities and powers beyond

---

[4] With regard to these common-law principles, *see, e.g.*, 2 William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private Corporations* §§ 392, 495 (perm. ed. rev vol. 1998); Robert S. Stevens, *Handbook on the Law of Private Corporations* §§ 145, 161 (2d ed. 1949); William J. Grange, *Corporation Law for Officers and Directors A Guide to Correct Procedure* 381–89 (1935), *see also* General Henry M Robert, *Robert's Rules of Order· Newly Revised* § 1, at 4, § 43, at 395 (9th ed 1990).

those which he might otherwise have (i.e., as simply the "chairperson"). October Hill Letter at 1–2. The term "Chief Executive Officer" ("CEO") comes from corporate law. CEOs and presidents of corporations, as a matter of corporate common law, are "subordinate in legal authority" to their corporations' boards of directors. Grange, *supra* note 4, at 450; *see* 2 Fletcher et al., *supra* note 4, § 495, at 528; Stevens, *supra* note 4, § 164, at 768. Their specific powers derive in large part from the resolutions and by-laws passed by those boards and from the practice and custom of the particular corporation. *See, e.g.*, Grange, *supra* note 4, at 451–52 (stating that the "chief determining factor is the usage of the particular corporation" and that "[i]n brief, the president exercises such powers as he is given by the board, or as he may assume with the board's acquiescence"); 2A William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private Corporations* § 553, at 14 (perm. ed. rev. vol. 1982) (observing that the powers of a corporate president may be enlarged by a board's "practice of permitting him to do certain things without objection"). Thus, while it may not be unusual for a president and CEO of a corporation to possess substantial authority over corporate affairs, such authority exists largely as a matter of the board's grace and does not deprive the board of its ultimate authority to manage corporate business. *See, e.g.*, 2 Fletcher et al., *supra* note 4, § 495, at 528–29 (a board's delegation of authority to corporate officers does not mean that the board has abdicated its authority and does not deprive the board of its stated authorities and responsibilities); Stevens, *supra* note 4, § 164, at 768 (whatever the precise duties and powers of a corporate president, "the authority and duty to manage the corporate business is vested exclusively in the board of directors"). Nothing in the Act suggests that this general understanding of what it means to be a CEO should not obtain in the specific case of the Board.

We do not agree that the Act provides the chairperson "with complete authority over all aspects of the [Board] except that all of the Board Members must vote on three items: approval of Board Investigation Reports, recommendations to the Administrator of EPA and the Secretary of Labor, and approval of regulations to be published in the *Federal Register.*" December Hill Letter at 1. In support of that reading, the former chairperson points out that "[t]he Congress has repeatedly segregated these responsibilities through 'reorganization plans' of various multi-member boards and commissions in the past." *Id.* But whatever the import of such reorganization plans,[5] the Act itself in no way suggests that the Board's

---

[5] A large number of reorganization plans exist, most of which can be found in appendix 1 to title 5 of the United States Code, and we have not examined the provisions of each one in detail. However, our brief review of the plans has revealed no evidence of the repeated segregation of responsibilities of the sort described in the former chairperson's submission. *See generally* 5 U.S.C app. 1. In fact, such plans are generally intended only to improve the efficiency of the housekeeping and day-to-day operations of multi-member bodies by placing primary responsibility for such affairs with a chairperson, not to effect a large-scale transfer of significant powers and authorities to the chairperson from the body as a whole. *See, e.g.*, David M. Welborn, *Governance of Federal Regulatory Agencies* 9 (1977) (discussing reorganizations), *see also* Special Message to the Congress Transmitting Reorganization Plans 1 Through 13 of 1950, *Pub. Papers of Harry S. Truman* 199, 202 (1950) ("[T]hat under these . . . plans
Continued

chairperson is vested "with complete authority over all aspects" of Board business except the three responsibilities just mentioned. Indeed, as we explain above, the language of the Act and the general principles of corporate common law against which it must be read belie that conclusion. The Act's legislative history does mention these responsibilities in the context of delegation, stating that the Board "may (by vote) delegate responsibilities to the chairperson or other member, except that it shall require a majority vote of the full Board to issue a report on the cause or probable cause of an accident, make a recommendation to the Administrator [of EPA] or the head of another Federal agency, or promulgate a rule." S. Rep. No. 101–228, at 229, *reprinted in* 1990 U.S.C.C.A.N. at 3613. This statement, however, only makes clear Congress's intent that the Board not delegate these responsibilities to the chairperson or any other single member. It does not suggest that these responsibilities are the only ones that are, in the first instance, vested in the full Board. In fact, by stating that the Board may delegate all other responsibilities, it suggests the opposite, for the Board could not make the delegation if those responsibilities were committed to the chairperson instead of the Board as a whole.

Along similar lines, we do not attribute great significance to the fact that, as is apparent from the Act's legislative history, Congress contemplated that the Board would be "modeled on the structure, activities and authorities of the National Transportation Safety Board (NTSB), an independent Federal agency which investigates accidents in the transportation industry." S. Rep. No. 101–228, at 228, *reprinted in* 1990 U.S.C.C.A.N. at 3612. Even if the chairperson of the NTSB is the chief moving force on the NTSB and principally responsible for executing its policies, it does not follow that the Board's chairperson also should be understood to have expansive authority over nearly all of the Board's affairs. *See* October Hill Letter at 2; December Hill Letter at 1. The division of authority at the NTSB upon which the former chairperson focuses is much less a matter of statutory mandate than it is a matter of the development, through collegial practice and over time, of the NTSB's own internal policies concerning delegation of authority to the NTSB chairperson, the NTSB's acquiescence in the chairperson's assertion of authority over certain substantive areas, and the general evolution of the NTSB's current allocation of responsibilities. *See, e.g.*, Letter for Randolph D. Moss, Acting Assistant Attorney General, Office of Legal Counsel, from the Chemical Safety and Hazard Investigation Board at Attach. 1 (Dec. 27, 1999) (discussing development of division of responsibilities at the NTSB). Indeed, as it existed in 1990, when the Act was passed, the statute establishing the NTSB stated that "[t]he Chairman . . . shall be governed by the general policies established by the Board, including any decisions, findings, deter-

---

the commissions retain all substantive responsibilities deserves special emphasis. The plans only eliminate multi-headed supervision of internal administrative functioning. The commission[s] retain policy control over administrative activities since these are subject to the general policies and regulatory decisions, findings, and determinations of the commissions.").

minations, rules, regulations, and formal resolutions.'' Pub. L. No. 93–633, § 303(b)(3), 88 Stat. 2156, 2167 (1975).[6] The legislative history emphasized this point. ''The Chairman,'' it provided, ''is to be the chief executive officer of the Board, but in acting as such, he is subject to the decisions and policies decided upon by the entire Board, and it is intended that each member shall participate actively in all aspects of the executive function.'' S. Rep. No. 93–1192, at 43 (1974).

That the NTSB's chairperson may, as a matter of internal NTSB policy and longstanding practice, exercise significant authority and influence over many substantive and procedural aspects of NTSB operations does not dictate that the Board's chairperson be allowed to do the same. Had Congress intended that result, it could have looked to the specifics of the division of authority within the NTSB in 1990 and spelled out a similar division of authority more explicitly in the Act. It did not do so. Instead, as discussed above, the Act leaves the Board free to shape and structure the details of its own internal operations in large part as it sees fit, and to do so in a practical matter, over time and on a case-by-case basis as its goals and agenda demand. The Board ultimately may or may not think it appropriate to follow a course similar to that of the NTSB. In any event, the Board's determination of the appropriate division of authority between itself and its chairperson will of necessity turn on considerations of internal administration and practical working arrangements within the Board.

RANDOLPH D. MOSS
*Acting Assistant Attorney General*
*Office of Legal Counsel*

---

[6] At the time of the Act's passage, the NTSB's organic statute provided in pertinent part as follows

The Chairman shall be the chief executive officer of the Board and shall exercise the executive and administrative functions of the Board with respect to the appointment and supervision of personnel employed by the Board, the distribution of business among such personnel and among any administrative units of the Board; and the use and expenditure of funds  . . The Chairman . . . shall be governed by the general policies established by the Board, including any decisions, findings, determinations, rules, regulations, and formal resolutions

Pub  L  No  93–633, § 303(b)(3), 88 Stat. 2156, 2167 (1975)